Cordero, Juez Ponente
*902 TEXTO COMPLETO DE LA SENTENCIA
Oportunamente, la Autoridad de Acueductos y Alcantarillados (“AAA”) presentó un escrito de Certiorari en el que nos solicitó la revisión de la Resolución emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (“TPF), el 3 de octubre de 2003, notificada el 8 de octubre de 2003, mediante la cual se declaró No Ha Lugar a una solicitud de descalificación de representación legal presentada por la AAA.
I
El 11 de abril de 2001, American International Insurance Company of Puerto Rico presentó una “Demanda para Solicitar Sentencia Declaratoria” sobre la interpretación de la cubierta de ciertas pólizas de seguro en el Proyecto del Superacueducto (“Proyecto”). La controversia tiene como eje principal los eventos durante el diseño, construcción y posibles defectos de los materiales empleados en el Proyecto. Posteriormente, el 11 de octubre de 2001, Atlantic Pipe Corporation (“Atlantic”), solicitó intervención en el procedimiento. A su vez, Atlantic presentó “Demanda en Intervención” contra Thames Dick Superacueduct Partners, Inc. (“Thames”), en la cual alegó que el sistema de abastecimiento de agua del Proyecto fue operado de manera imprudente, negligente y en contravención a las normas y protocolos de operación aplicables y sin precaución alguna.
Posteriormente, Atlantic presentó el 21 de febrero de 2002 “Demanda de Terceros” para traer al litigio todas las partes que, a su entender, son responsables de la ruptura al sistema de abastecimiento de agua y consecuentes daños reclamados, por lo que incluyó en el caso ante el TPI a la AAA como administradora y dueña de los sistemas de abastecimiento de agua en Puerto Rico. Atlantic alegó: (1) incumplimiento con las obligaciones contractuales por la alegada negligencia en la inspección de la obra de construcción; (2) ausencia de adecuada evaluación, supervisión e inspección bajo los términos del “Master Agreement(3) incumplimiento en la obligación contractual de inspeccionar que la obra se realizara conforme al “Master 'Agreement’; (4) operación negligente de los sistemas de abastecimiento de agua, y (5) negligencia en la operación del sistema de niveles. La AAA contestó la demanda presentada por Atlantic el 4 de septiembre de 2002. Así, comenzó un voluminoso descubrimiento de prueba y un sinnúmero de trámites procesales que no son relevantes en la consideración de la controversia ante nos.
El 2 de septiembre de 2003, la AAA presentó una “Solicitud de Descalificación de Representación Legal” en la cual solicitó la descalificación de la representación legal de Atlantic que ostentaba el bufete de Cando. En síntesis, la AAA señaló que Cando le representó por varios años en decenas de casos. Uno de los casos en el que Cando representó a la AAA fue en defensa del Proyecto durante la fase de construcción del mismo cuando se alegó que la AAA fue negligente al cumplir con la reglamentación ambiental. (Misión Industrial de Puerto Rico, Inc. v. Junta de Planificación de Puerto Rico, AAA, et al, 142 D.P.R. 656 (1997); Misión *903 Industrial de Puerto Rico, Inc. v. Junta de Planificación de Puerto Ricio, et al, 146 D.P.R. 64 (1998)), por la que entiende que existe una representación sucesiva adversa detrimental a los intereses de la AAA. A su vez, señaló que para la fecha en que Cando representó los intereses de la AAA, ya estaba firmado el “Master Agreement Así, la AAA entiende que Cando advino en conocimiento de información confidencial y privilegiada de la AAA, particularmente sobre la metodología y preparación de ésta y sus consultores con relación al Proyecto. La AAA sostuvo que “la mera posibilidad de que un conflicto de intereses se genere, convierte automáticamente la representación legal en una conducta antiética y en contraste con los principios consagrados en el Código de Etica Profesional....”. A su vez, la AAA presentó una “Solicitud de Ordenes Protectoras” para impedir la continuación del descubrimiento de prueba a Atlantic.
Por su parte, Atlantic presentó el 12 de septiembre de 2003 la “Oposición de Atlantic Pipe a Solicitud de Descalificación de Representación Legal” mediante la cual indicó que Cando no fue representante legal de la AAA en los asuntos relacionados con los hechos ante el TPI y que cualquier representación anterior no estaba sustancialmente relacionada con la controversia vigente. Atlantic señaló que la intervención de Cando en cuanto al Proyecto fue con relación a los argumentos ambientales (declaración de impacto ambiental) y consulta de ubicación, es decir, aún no se había adjudicado ni la ubicación final del Proyecto. Además, indicó que a la fecha de la solicitud de descalificación, era una que se utilizaba para retardar los procedimientos “...ya se han tomado deposiciones, se han producido volúmenes de cientos de miles de páginas de documentos, se ha examinado y presentado evidencia gráfica o demostrativa, se han celebrado inspecciones oculares, se han llevado a cabo varias vistas judiciales para organizar los procedimientos, etc. así entiende que no existe una relación sustancial con los asuntos trabajados por Cando para la AAA y la Demanda de Terceros presentada por Atlantic, por lo que no procede la descalificación. 
Posteriormente y en la vista celebrada el 29 de septiembre de 2003 ante el TPI, las partes estipularon que: (1) Cando fue abogado de la AAA, y (2) Cando no participó en el proceso de redacción, consumación del “Master Agreement” a virtud del cual se inició la planificación, desarrollo y construcción del Proyecto.
El 30 de septiembre de 2003, la AAA presentó “Suplemento a Solicitud de Descalificación” reiterando su posición.
Finalmente, el TPI emitió Resolución el 3 de octubre de 2003, notificada el 8 de octubre de 2003, mediante la cual determinó que:

“En la situación aquí planteada, no hay duda de que existe una representación sucesiva adversa. CNR&D [Cando] fue abogado de la AAA en dos asuntos relacionados con el Proyecto y actualmente representa a APC [Atlantic],-la cual presentó en este pleito una demanda de tercero contra la AAA-, en el caso de autos, el cual trata sobre el Proyecto. No obstante, la evaluación de la prueba presentada por las partes, a la luz de las controversias envueltas en este pleito, nos lleva a concluir que no existe la relación sustancial requerida para descalificar a CNR&D.

Las controversias principales del caso de epígrafe se refieren a las causas que motivaron dos rupturas que ocurrieron el 11 de septiembre de 1999 en la tubería del Proyecto en Dorado y Manatí. Entre otras, se plantea si hubo defectos, negligencia o errores en los planos y diseño del Proyecto, la inspección de la construcción del Proyecto, la operación del sistema de abasto de agua y la manufactura e instalación de la tubería fabricada por APC. No hay controversias en este pleito sobre la franquicia de agua ni la consulta de ubicación del Proyecto.

De la prueba presentada por la AAA y CNR&D, surge que la representación y asesoramiento legal de los abogados (CNR&D) al cliente (la AAA) se limitó a dos asuntos aquí pertinentes. El primero se refería a una controversia ante el Departamento de Recursos Naturales en cuanto a la franquicia para el aprovechamiento 
*904
del uso de las aguas del Proyecto. Esta controversia surgió antes de que se comenzara la construcción del Proyecto y no se presentó prueba de su relación con las controversias de este caso.

El otro asunto se relaciona con la aprobación de la DIA del Proyecto en el ámbito de una oposición a un recurso de revisión que se presentó ante el TCA (Caso Núm. KLRA-96-00284). En este recurso, Misión Industrial cuestionó la aprobación de la consulta de ubicación del Proyecto que hizo la Junta de Planificación porque alegadamente se violaron las Leyes de Aguas y Política Pública Ambiental, Reglamentos de la Junta de Calidad Ambiental y la política pública de protección de las zonas agrícolas. Estos hechos y controversias no se han planteado en el caso de autos.

Tampoco se aportó prueba, ni surge de nuestro examen del escrito presentado por CNR&D ante el TCA que dicho bufete interviniera en asuntos relacionados sustancialmente con los hechos y las controversias de este caso. Y el Ing. Camacho 
 declaró que el Lie. Santiago no se relacionó con los métodos de construcción del Proyecto y éste, a su vez, testificó que no recibió información de la AAA sobre incumplimientos contractuales o deficiencias de inspecciones del Proyecto.

Además, una evaluación de los intereses en conflicto, conforme los criterios establecidos por el Tribunal Supremo, nos llevan a concluir que no procede la petición de la AAA. Este es un litigio complejo en el que hay veintidós (22) partes y están envueltas controversias que envuelven materias sumamente técnicas. Los abogados de CNR&D han tenido que prepararse en estos asuntos técnicos por alrededor de dos años, lo que ha requerido una inversión sustancial de recursos de APC. El caso se encuentra en una etapa avanzada del descubrimiento de prueba, la conferencia con antelación al juicio está señalada para el 19 de febrero de 2004 y la vista en su fondo para el mes de marzo de 2004. Ciertamente, la descalificación de CNR&D tendría un efecto negativo en la solución justa, rápida y económica de este pleito, ya que habría que paralizar el descubrimiento de prueba, lo que conllevaría la suspensión del juicio.” (Enfasis suplido.)
Por tanto, el TPI declaró No Ha Lugar la solicitud de descalificación, ya que concluyó que no se probó "... que exista relación sustancial entre los hechos y las controversias de este pleito y en las que anteriormente CNR&D asesoró y representó a la AAA y la evaluación de los criterios sobre los intereses en conflicto inclinan la balanza en contra de la solicitud de la AAA. ”
La AAA presentó oportuna moción de reconsideración, la cual fue declarada No Ha Lugar el 21 de octubre de 2003. Inconforme, la AAA compareció ante nos y señaló en suma que erró el TPI al no descalificar la representación legal que ostentaba Cancio a favor de Atlantic.
II
El Canon 21 del Código de Etica Profesional, 4 L.P.R.A. Ap. IX, el cual regula particularmente la representación de intereses encontrados por los abogados, dispone:

“El abogado tiene para con su cliente un deber de lealtad completa'.' Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas y cualquier interés en controversia que pudiera influir en el cliente al seleccionar su consejero. Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.

No es propio de un profesional el representar intereses encontrados. Dentro del significado de esta regla, un abogado representa intereses encontrados cuando, en beneficio de un cliente, es su deber abogar por aquello a que debe oponerse en cumplimiento de sus obligaciones para con otro cliente.

La obligación de representar al cliente con fidelidad incluye la de no divulgar sus secretos o confidencias y la de adoptar medidas adecuadas para evitar su divulgación. Un abogado no debe aceptar la representación 
*905
legal de un cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior ni servir como árbitro, especialmente cuando el cliente anterior le ha hecho confidencias que puedan afectar a uno u otro cliente, aun cuando ambos clientes así lo aprueben. Será altamente impropio de un abogado utilizar las confidencias o secretos de un cliente en perjuicio de éste.

Un abogado que representa a una corporación o sociedad, le debe lealtad a la persona jurídica y no a sus socios, directores, empleados o accionistas y solamente puede representar los intereses de dichas personas cuando los mismos no vengan en conflicto con los de la corporación o sociedad.'” (Enfasis suplido.)
Ciertamente, la representación sucesiva de un cliente coloca al abogado en una posición sumamente peligrosa. Al aceptar la representación adversa, se somete a la tentación de hacer uso de la información obtenida previamente. Independientemente de su buena fe, se ha reiterado que deben existir salvaguardas para garantizar la confidencialidad de los secretos de un cliente anterior. Developments in the Law: Conflicts of Interest in the Legal Profession, 94 Harv. L.Rev. 1244,1315-17 (1981).
En Liquilux Gas Corp. v. Berrios, Zaragoza, 138 D.P.R. 850, 857-858 (1995), el Tribunal Supremo estableció que la obligación de representar a un cliente incluye, entre otras cosas, ejercer un criterio profesional independiente y desligado de sus propios intereses y de no divulgar los secretos y confidencias que el cliente haya compartido durante el transcurso de sus representaciones pasadas y presentes. La prohibición de aceptar la representación de un cliente en asuntos que puedan afectar cualquier interés de un cliente anterior tiene como objetivo el garantizarle a todo cliente que las confidencias y secretos que compartió con su abogado no serán utilizadas en su contra en beneficio de una representación antagónica de un cliente simultáneo o posterior. Otaño v. Vélez, 141 D.P.R. 820, 825-826 (1996); P.R. Fuels, Inc. v. Empire Gas Co., Inc., 133 D.P.R. 112, 118 (1993).
Una moción de descalificación para que un abogado o bufete se abstenga de representar a una parte por alegado conflicto de intereses y una posible violación al Canon 21 de Etica Profesional, supra, es reconocida como una medida preventiva para evitar una posible violación ética y no como una acción disciplinaria. Por consiguiente, un tribunal, en el ejercicio de su poder inherente de supervisar la conducta de los abogados que postulan, puede entender y resolver dicha moción cuando la misma surge como controversia colateral en el caso pendiente ante sí. Meléndez Vega v. Caribbean International News, _ D.P.R. _ (2000), 2000 J.T.S. 108, a lapág. 1400; Liquilux Gas Corp. v. Berrios, Zaragoza, supra, a lapág. 864; K-Mart Corp. v. Walgreens of P.R., Inc., 121 D.P.R. 633, 637-638 (1988). La descalificación de un abogado puede ser ordenada para prevenir una violación a cualquiera de los Cánones de Etica Profesional, supra, o para evitar actos disruptivos de los abogados durante el trámite de un pleito. Por ello, los tribunales de instancia tienen la facultad de ordenar motu proprio la descalificación de un abogado o de otorgar la misma accediendo a una solicitud de una parte. Meléndez Vega v. Caribbean International News, supra, a las págs. 1400-1401. Ello no significa que la mera presentación de una moción de descalificación de lugar, sin más, a que ésta se ordene. Liquilux Gas Corp. v. Berrios, Zaragoza, supra, a la pág. 864.
En las situaciones donde la parte contraria solicite la descalificación, el tribunal debe considerar: (1) si quien solicita la misma tiene legitimación activa para invocarla; (2) la gravedad del conflicto de interés envuelto; (3) la complejidad del derecho o los hechos pertinentes a la controversia; (4) el peritaje de los abogados envueltos; (5) la etapa de los procedimientos en que surja la controversia sobre descalificación; (6) su posible efecto en cuanto a una solución justa, rápida y económica del caso, y (7) el propósito detrás de la descalificación, es decir, si la moción está siendo utilizada como mecanismo procesal para dilatar los procedimientos. Otaño v. Vélez, supra, a la pág. 828; Liquilux Gas Corp. v. Berrios, Zaragoza, supra, a las págs. 864-865. De igual forma, también se debe tomar en consideración el derecho que tiene todo ciudadano de seleccionar libremente al abogado que desea que lo represente. A esos efectos, se impone el asegurarse que en un procedimiento de descalificación el abogado tenga la oportunidad de ser escuchado y de presentar prueba a *906 su favor. Otaño v. Vélez, supra, a la pág. 828; In re: Vélez, 103 D.P.R. 590, 599 (1975).
De otra parte, la mera apariencia de impropiedad es suficiente para que un tribunal descalifique motu proprio a un abogado que pudiera entrar en un conflicto de intereses. No es necesaria la aportación de prueba sobre la violación ética. Lo único que es requerido es una relación previa de abogado-cliente y que dicha representación resulte adversa y esté sustancialmente relacionada con la anterior. Otaño v. Vélez, supra, a las págs. 827-828; P.R. Fuels, Inc. v. Empire Gas Co., Inc., supra, a la pág. 119; In re: Martinez Ramírez, 142 D.P.R. 329, 345 (1997).
En el contexto del deber de lealtad, puede decirse que los intereses de dos clientes difieren si son conflictivos, inconsistentes o diversos. In re: Carrera Rovira y Suárez Zayas, 115 D.P.R. 778, 789 (1984). La formula de "relación sustancial" se elaboró para garantizar al cliente anterior que las confidencias y los secretos que compartió con su abogado en el transcurso de la primera representación no serán utilizados en su contra en representaciones posteriores. Ex Parte Robles Sanabria, 133 D.P.R. 739, 750 (1993). Bajo este criterio, la parte que solicita la descalificación sólo tiene que demostrar que la controversia legal envuelta en el pleito en la que el abogado comparece en su contra estaba relacionada sustancialmente con la materia o causa de acción en la que tal abogado previamente le representó. In re: Carrera Rovira y Suárez Zayas, supra, a la pág. 791. En fin, “el cliente no tiene que probar una violación actual al principio de confidencialidad. Sólo se requiere una relación previa de abogado y cliente y que tal representación resulte adversa y esté sustancialmente relacionada con la anterior." (Enfasis nuestro.) Id.
Por último, el Tribunal Supremo ha denominado la descalificación imputada o vicaria como aquélla que recae sobre un bufete o grupo de abogados, por razón de la descalificación de uno o más de sus miembros, debido a un conflicto de intereses. Esta norma está apuntalada en supuestos de sentido común y en la experiencia de cómo trabajan los abogados que ejercen en bufetes y los motivos que le lleven a compartir información y aunar esfuerzos. P.R. Fuels, Inc. v. Empire Gas Co., Inc., supra, a las págs. 119-120. En el caso particular de bufetes de abogados, será importante considerar si los abogados que trataron con el cliente anterior son los que están en el lado opuesto en el presente caso o si permanecen como asociados del bufete; o si por el contrario, dichos abogados ya no forman parte de éste. En cuanto a este último asunto, debemos advertir, además, que cuando la moción de descalificación incluya no sólo a un abogado, sino también al bufete al cual éste pertenezca, será necesario determinar si la descalificación del abogado en particular (conocida como descalificación primaria), debe imputársele al bufete en general (conocida como descalificación imputada). Es decir, si la descalificación del abogado conlleva la descalificación del bufete en el que labora. Liquilux Gas Corp. v. Berrios, Zaragoza, supra, a la pág. 865. Bajo la doctrina de la descalificación imputada se autoriza la imputación de la causal de descalificación primaria a todos los abogados del bufete o agrupación asumiendo una presunción de confidencias compartidas. Según sea el caso, esta presunción puede convertir al bufete o grupo de abogados en un sólo abogado, de manera que quedaría descalificado de aquella representación sucesiva adversa. Ex Parte Robles Sanabria, supra, a la pág. 752. Ahora bien, esta presunción no se activa de forma automática en todo caso y aplica únicamente a aquellos bufetes o grupos de abogados cuyo ambiente se caracterice por el libre flujo y fácil acceso a información o por incentivos considerables para que los abogados compartan información. Id. Aun en los casos en los cuales se determine que ésta aplica, esto no siempre conllevará la descalificación automática del bufete, si se demuestra razonablemente que no existe una razón de peso que justifique su descalificación. Liquilux Gas Corp. v. Berrios, Zaragoza, supra, a la pág. 866.
III
Como regla general, este Tribunal no interviene con el ejercicio de la discreción de los Tribunales de Primera Instancia, a menos que sea demostrado que hubo un craso abuso de discreción, que el Tribunal de Primera Instancia haya errado en la interpretación o aplicación de cualquier norma procesal o que nuestra intervención en esta etapa evitará un perjuicio sustancial. Lluch v. España Service Sta., 117 D.P.R. 729, 745 (1986).
*907 La principal disputa ante nos gira en torno a si existe o no una relación sustancial entre la representación previa por parte de Cancio a la AAA y la demanda de tercero incoada por Atlantic. A esos efectos, no cabe duda de que el peso de probar su existencia recae sobre la AAA como promovente de la descalificación. Sin lugar a dudas, la AAA posee legitimación activa para solicitar la descalificación, puesto que fueron los clientes de Cancio y éstos ahora son los abogados de Atlantic quienes presentaron la demanda de tercero contra la AAA en el caso de autos. No obstante, a pesar de que ciertamente existe una representación sucesiva adversa, no vemos y tampoco la AAA le demostró al TPI, la relación sustancial entre los casos anteriores y el caso de autos. Máxime cuando el abogado que trabajó por un corto lapso de tiempo el caso relacionado con la consulta de ubicación del Proyecto y la declaración de impacto ambiental, no forma parte del Bufete desde 1998. De otra parte, la controversia expuesta ciertamente requiere del esfuerzo y peritaje que han desarrollado todos los representantes legales a través de los más de dos años que comenzó el pleito, especialmente durante el proceso de mediación, el sinnúmero de deposiciones tomadas, los miles de documentos de descubrimiento de prueba, las reuniones y discusiones con peritos y los próximos señalamientos ante el TPI. Finalmente, la AAA no fue diligente al solicitar la descalificación de Cancio. Desde la notificación de la demanda contra tercero, la AAA debió saber del alegado conflicto de interés del que hoy intenta protegerse. Surge de los autos que desde el 2 de diciembre de 2002, la AAA tuvo conocimiento de la posición de Cancio de que no existía conflicto de interés. Sin embargo, nada hizo hasta el 2 de septiembre.de 2003. No vamos a considerar esa demora como un subterfugio para atrasar los procedimientos judiciales en instancia. No obstante, tal demora si se considerará como una falta de diligencia que provocaría una severa interrupción de los procedimientos, contrario a las disposiciones de la Regla 1 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III. No se puede premiar tal conducta.
Por otro lado y aún más importante, al declarar No Ha Lugar la descalificación de la representación legal de Atlantic, el foro recurrido analizó todo el expediente ante su consideración a la luz del derecho y la jurisprudencia aplicable. Al igual que el TPI, este Tribunal ha analizado minuciosamente la solicitud de descalificación de representación legal presentada por la AAA y hemos concluido que no existe una relación sustancial con la materia o causa de acción en la que Cancio representó previamente a la AAA. El caso ante nos es complicado y todas las partes merecen una solución justa, rápida y económica de la controversia ante el TPI. Ciertamente, el TPI no abusó de su discreción.
IV
Por los fundamentos antes esbozados, se expide el auto solicitado y se confirma la determinación del TPI sobre la improcedencia de la descalificación de Cancio.
Lo acuerda y manda este Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2004 DTA 35
1. La solicitud de intervención es como consecuencia de las alegaciones de que los tubos del Proyecto fueron manufacturados con desperfectos, materiales defectuosos y que mediaron errores en la rotulación. Atlantic fue el único suplidor de los tubos que se incorporaron al Proyecto. La representación legal de Atlantic lo es Cancio, Nadal, Rivera, Díaz & Berrios (“Cancio”).
2. Corporación contratada por la AAA para la construcción del Proyecto de acuerdo con el “Master Agreement” otorgado entre las partes.
3. La representación en este caso estuvo a cargo del licenciado Santiago, quien no labora en el Bufete de Cancio desde 1998.
*908 4. Este es el contrato de diseño-construcción-operación-mantenimiento que fue otorgado entre Thames y AAA para la operación del Proyecto objeto de controversia.
5. Del expediente surge que la AAA le comunicó a Cancio la posibilidad de conflicto de interés para el 22 de noviembre de 2002. Cancio, por su parte, el 2 de diciembre de 2002, indicó a la AAA las razones por las que entendía no existía el alegado conflicto de intereses.
6. El Bufete de Cancio fue consultado en casos laborables por la AAA. No obstante, la representación del Bufete de Cancio a través del licenciado Santiago, en cuanto al Proyecto, sólo se circunscribió a lo relacionado con la consulta de ubicación del Proyecto y la declaración de impacto ambiental en el período que comprendía de septiembre de 1996 a abril de 1997.
7. Este fue uno de los testigos presentados por la AAA.